## In re CORKILL.

**Patent Appeal No. 3720.**

Court of Customs and Patent Appeals.
Jan. 25, 1937.

C. Russell Riordon and Charles E. Riordon, both of Washington, D. C., for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming the decision of the Primary Examiner in rejecting claims 1 to 10, inclusive, and 12 to 20, inclusive, of appellant's application for a patent on certain products and improvements in a process of treating minerals. Claims 17, 18, and 19 are the product claims.

The Examiner allowed claims 11 and 21, while the remaining claims were rejected on the following references: (British) 330,146; Thorpe—Outlines of Industrial Chemistry; Rogers' Industrial Chemistry. (The two books relied on only for an understanding of the term "prismatic" borax.)

Claims 1, 12, 14, and 17 are typical of the rejected claims, and are as follows:

"1. That process of treating naturally occurring hydrous borate minerals in their crude state, to increase the stability thereof which comprises subjecting such mineral to heat, to remove water of crystallization therefrom, controlling the heat to maintain the temperature between 230° and 250° F., and simultaneously agitating the mineral.

"12. That process of treating naturally occurring hydrous sodium borate minerals in their crude state to increase its stability which comprises dehydrating the mineral at a temperature between 230° and 250° F., thereby removing approximately six molecules of the water of crystallization therein, and increasing proportionately the borate radical content therein, and then adding, by re-absorption, at least one molecule of water.

"14. That process of treating naturally occurring, hydrous boron minerals in their crude state which comprises separating from such mineral a portion of its water of crystallization, by dehydration, to increase the stability thereof, and controlling temperature and humidity conditions to a predetermined degree effective to produce in the mineral a borate radical content approaching that of octohedral borax.

"17. A product consisting of naturally occurring hydrous borate or borates, from which a portion of the water of crystallization has been removed and the specific gravity thereof reduced approximately 15%"

The process and product of the appellant have to do with minerals, particularly "boron bearing ores, containing hydrous borates such as rasorite, tinkal, ulexite," and the like. The application discloses reducing the liquid content of the crude ores and establishing a resulting stable product, so that the same will not have a tendency to lose more of its water content or to absorb further water content. The appellant explains that the boron minerals, as found in nature, are usually unstable as to their water content, and that he has discovered that by driving off a part of their molecules of water, down to a point where the product contains but five molecules, which is said to be the water content of a stable boron mineral known as octohedral borax, the specific gravity of the resulting product is decreased, and its stability will be preserved indefinitely during shipment and otherwise.

In order to produce this stable condition, the appellant proposes to subject the crude mineral to a temperature heated slightly above the boiling point, namely, 230° to 250° F. The raw material is placed in a long cylindrical revolving tank in which it is exposed to heated gases and through which it passes slowly until it is discharged at the far end of the revolving cylinder. The heat is kept at a point where the boron mineral will not lose any crystalline formation which it may have, and before the process is completed, is reduced in water content to a content of five molecules, or is reduced to a water content of four molecules, to which one additional molecule is added. The cylinder which is used in the process is about six feet in diameter, eighty feet in length, and revolves at a speed of about four revolutions per minute.

The tribunals of the Patent Office allowed to the appellant two claims, 11 and 21. Claim 11 provides for a temperature of between 230° F. and 250° F., "under conditions which will remove approximately six molecules of the water of crystallization and then permitting the dehydrated minerals to reabsorb at least one molecule of water."

Claim 21 provides for a similar heating with the "removal of approximately five molecules of the water of crystallization, leaving a stable dehydrated mineral containing approximately five molecules of water."

The only reference which is thought to be anticipatory of the rejected claims is the British patent, No. 330,146, which concerns a calcined borax and process of producing the same. In this patent, which was issued in 1930, the ordinary borax of commerce, containing ten molecules of water per unit, is converted into a partly dehydrated or calcined form. The purpose of this is to save costs in transportation. The patent discloses that borax will ordinarily intumesce or puff to a large volume when it is heated to bring about calcination, and it is desired to decrease this puffing by the process disclosed. The patent discloses the reduction of the quantity of water in the borax by subjecting it to a temperature below the melting point of the crystallized borax. The process is carried out in a series of steps, at a comparatively low temperature, in a series of chambers, which successively reduce the amount of water so that the number of molecules is, successively, 10, 8, 6, 4, 2, and finally none.

The crystalline form of the product is, continuously retained, the temperatures being graduated in the successive chambers, the first step using temperature of 50° to 100° C., the second from 65° to 150° C., and the third from 125° to 200° C. From this point the temperature rises as the molecules of water decrease.

The patent states that in lieu of a series of chambers, a single long chamber may be used and so arranged that the borax and air are passed from end to end countercurrent to each other.

From a consideration of the British patent, it is apparent that several features of the appellant's process are disclosed in said British patent, namely, the agitation of material as is claimed in several claims of appellant's application, and the retention of a low degree of heat insufficient to change the crystalline form of the structure. In the third chamber, for instance, provided by the British patent, the temperature closely approaches that mentioned in appellant's application. In fact, inasmuch as the effects produced are exactly the same in both cases, namely, the avoidance of a change in the crystalline structure of the material, it is not perceptible where there is any patentable difference between the temperatures provided by the appellant's application and that disclosed in the third chamber of the British patent, or wherein such difference is critical.

It appears, therefore, that certain of the rejected claims were anticipated by the disclosures of the British patent. These include claims 1 to 10, inclusive.

Claims 12 and 14, however, present a different problem. Claim 12 recites a dehydration "thereby removing approximately six molecules of the water of crystallization therein, * * * and then adding, by re-absorption, at least one molecule of water."

Claim 14 recites, in part, the dehydration "effective to produce in the mineral a borate radical content approaching that of octohedral borax."

The tribunals of the Patent Office were of the opinion, as evidenced by their allowance of claims 11 and 21, that the dehydration of boron mineral to a point where it reached the stable condition of octohedral borax, namely, one in which the water content amounted to five molecules per unit, was patentable, and not disclosed by the prior art as disclosed by the British patent. With that finding, we agree. It

is not disclosed at any place in the British patent that the patentee had this state of stability in mind, or that he had any process by which the said degree might be produced. The process did not produce this condition, according to the specification of the British patent, and no claim was therein made for any such result or process. If this be true, claims 12 and 14 would seem to be patentable. Claim 14 is, in effect, a claim for the production of a borax with five molecules of water, which is shown by the statement of the Examiner, concurred in by the Board of Appeals, to be a borax containing five molecules of water, or the natural stable condition of octohedral borax.

We are, therefore, of the opinion that claims 12 and 14 should have been allowed.

Claims 13, 15, 16, and 20 were, in our opinion, properly rejected by the Board of Appeals. They include, in our judgment, only elements which are fully disclosed by the British patent.

Product claims 17, 18, and 19 are objectionable for the following reasons given by the tribunals of the Patent Office: Claim 17 simply recites a product which may be the result of the process fully disclosed in the British patent. Claims 18 and 19 provide for a product "retaining substantially the original prismatic crystal formation of the crude borate." Such a product is also fully disclosed by the British patent. It is apparent, therefore, that the appellant has disclosed, in these claims, no product new to the art.

The decision of the Board of Appeals is reversed as to claims 12 and 14, and affirmed as to the remaining claims on appeal.